UNITED STATES, Appellee

v

HAYWARD E. HAWTHORNE, Private E–2, U. S. Army, Appellant

7 USCMA 293, 22 CMR 83

294

No. 8077

Decided August 24, 1956

*Captain John F. Christensen* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel Stanley F. Flynn.*

*First Lieutenant Peter J. Hughes* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton, Captain Vernon M. Culpepper,* and *Captain Thomas J. Nichols.*

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused was tried for operating a military truck while drunk (Charge I), being drunk on duty (Charge II), and misappropriating a Government vehicle by deviating from his normal

296

route on the post (Charge III). He was acquitted of Charges I and II and convicted on Charge III. After evidence of three previous convictions was introduced, and defense counsel made an unsworn statement on behalf of the accused, the court adjudged a sentence of dishonorable discharge, total forfeitures, and confinement at hard labor for one year. The convening authority modified the sentence by reducing the period of confinement to 11 months. He ordered the sentence executed, except that part relating to the dishonorable discharge. A divided board of review affirmed. We granted review to determine whether the Commanding General, Fourth Army, exercised improper control over the proceedings.

On September 20, 1954, the Commanding General, Fourth Army, published a policy declaration in regard to the elimination of Regular Army offenders. In pertinent part, the policy directive reads as follows:

"SUBJECT: Elimination of RA repeated Offenders

• • • • • •

"3. These statistics show that Regular Army personnel, constituting 38% of the troop strength of Fourth Army, account for 64% of the courts-martial.

"5. It is desired that commanders give vigilant attention to the elimination from service of Regular Army personnel who have demonstrated by repeated misconduct a weakness of character which renders them unfit to serve. Inductees, however, should be retained for their full term of service in each case within reason in order that compulsory service will not be evaded through a deliberate design of misconduct. Regular Army personnel, on the other hand, will not be retained for any period longer than is absolutely necessary after they have demonstrated an inability or lack of inclination to reflect credit upon the service. Consideration for elimination will be exercised in the following order:

a. *Elimination by a punitive discharge under a sentence by court-martial.* As a general rule, any charge against a Regular Army soldier with two admissible previous convictions should be referred to a general court-martial in order that para 127, Sec B, MCM, may be fully utilized.

b. *Resignation in lieu of trial by court-martial under the provisions of para 6, AR 615–367.*

c. *Elimination through appropriate Board action.*

• • • • • •

"7. This matter in information as to the state of discipline within the Command and, in accordance with the provisions of para 38, MCM, this letter will be brought to the attention of every member of every general courts-martial hereafter appointed. Care will be taken, however, that such action is taken prior to any case being referred for trial to the courts concerned."

The accused is a Regular Army soldier. Within the two-year period immediately preceding the present offense, he was convicted by a summary court on two occasions for being drunk and disorderly in a public place, and once by a special court for drunkenness, breach of restriction, and attempted escape from the custody of a military policeman. On June 4, 1955, his commanding officer, Captain Novaky, preferred charges against him and forwarded them to the next higher authority. In the letter of transmittal, Captain Novaky said: "In view of the Fourth Army Policy regarding Regular Army EM, having two or more previous convictions within a period of two years, I recommend trial by General Court." By indorsement, the addressee concurred in the recommendation. Two other commanding officers intermediate to the convening authority, the Commanding Officer, Fourth Army, also recommended trial by general court-martial.

This Court has consistently held that any circumstance which gives even the appearance of improperly influencing the court-martial proceedings against the accused must be condemned. In regard to the pretrial proceedings, we

set aside a conviction because, in his advice to the convening authority, the Staff Judge Advocate misstated the Investigating Officer's recommendation for trial. United States v Greenwalt, 6 USCMA 569, 20 CMR 285. And in United States v Littrice, 3 USCMA 487, 13 CMR 43, we reversed the accused's conviction because of pernicious suggestions made by the convening authority to members of the court-martial in a pretrial conference with them. On the post-conviction level, we invalidated the proceedings when it appeared that the record of trial was reviewed by a person having a personal interest in the outcome of the litigation. United States v Turner, 7 USCMA 38, 21 CMR 164. We took similar action wherever it' seemed that the convening authority's own review was based upon the strictures of an ostensibly inviolable policy by superior authority, rather than upon his independent judgment in the individual case. United States v Doherty, 5 USCMA 287, 17 CMR 287.

It is not always easy to determine when a particular circumstance constitutes an improper influence. Thus, in United States v Littrice, supra, and in United States v Navarre, 5 USCMA 32, 17 CMR 32, we had before us the question of the effect of certain references to the efficiency rating of court members based on court-martial duty, which were made by the convening authority in a pretrial conference with the court members. In Littrice, this Court concluded that in the light of all the surrounding circumstances, the references constituted "command control." However, in Navarre, a divided Court determined that the surrounding facts demonstrated that the comments were innocent and innocuous.

Under the Uniform Code of Military Justice and the Manual for Courts-Martial, United States, ■ 1951, the commander having summary court-martial jurisdiction over the accused has substantial discretion to determine whether charges should be disposed of administratively or by court-martial. Article 15, Uniform Code of Military Justice, 50 USC § 571. Manual for Courts-Martial, supra, paragraph 32c, f,

and paragraphs 128b, 129. If the charges are to be submitted for trial by special or general court, the commanding officer must forward the charges by letter of transmittal, which among other things, should contain a specific recommendation as to the disposition of the charges. Manual for Courts-Martial, supra, paragraph 32f (4) (e). Moreover, consistent with the fundamental purposes of the Uniform Code to assure a just punishment in each individual case (United States v Wise, 6 USCMA 472, 20 CMR 188; United States v Lanford, 6 USCMA 371, 20 CMR 87), the Manual directs that if the charges are to be "tried at all, [they] should be tried at a single trial by the lowest court that has power to adjudge an appropriate and adequate punishment." Manual for Courts-Martial, supra, paragraph 30f. The fact that the Table of Maximum Punishments authorizes punishment for particular offenses in excess of that which can be adjudged by a summary or special court-martial, does not itself preclude reference of the charges to such inferior court. And if the commander concludes that it would be a just punishment if the court adjudges a punitive discharge, upon conviction of the offense charged, consideration should be given to the "court the case should be referred in order that the appropriate kind of discharge—dishonorable or bad conduct—may be adjudged." Manual for Courts-Martial, supra, paragraph 33h. At the same time, the established policies promulgated by superior authority should be considered.

Relying upon the above provisions of the Uniform Code and the Manual, the accused attacks the proceedings against him on several grounds. One of these is that Fourth Army policy was deemed, by Captain Novaky, the accused's immediate commander, to be mandatory. As a result, no attention was given by him to the other factors which are enumerated in the Manual and which would normally be important in reaching a decision as to the disposition of the charges, and in determining the court to which they should be referred, if trial by court-martial is deemed appropriate. After careful

consideration of the captain's letter and the policy instruction, we conclude that the latter appears to be inviolable. See United States v Wise, supra; United States v Doherty, supra.

Two statements stand out in bold relief. First, the directive provides that consideration for elimination from the service "will be exercised in the following order." At the very head of the list is trial by general court-martial. Plainly, therefore, the normal procedure for disposing of a charge by the lowest appropriate court-martial is ignored. Instead, the charges must uniformly be referred to the highest court. The second point of emphasis on command rather than suggestion is the statement that "any charge" will be referred to a general court-martial. The accused's commander is deprived of his discretion. Even the most trivial offense must be referred to the highest court in the court-martial system. Necessarily, therefore, an offense in the twilight zone, such as the one in the present case, which might otherwise appropriately be referred to a special court-martial, is sent to a general court.[1]

Perhaps, as the Government contends, the policy directive was not actually intended to put subordinate commanding officers "in a mental strait jacket which denies . . . [them] any freedom of choice." United States v Doherty, supra, page 294. Unquestionably, however, the language used is susceptible of such construction. In our opinion, there is a strong risk that it was so construed by appropriate courts-martial commanding officers.

We fully appreciate the commanding general's need for broad regulatory authority in his command for the maintenance and improvement of discipline for the effective fulfillment of his assigned mission. We have no disposition to curb him in the exercise of his powers. On the contrary, we have consistently upheld him when he has exercised his proper functions. For example, in United States v Gray, 6 USCMA 615, 620, 20 CMR 331, we

pointed out that a "commander has plenary power over his subordinate officers regarding command functions." However, when the commander extends his authority into forbidden areas, we must strike down his action. Here, he acted improperly in a field outside his command competency.

Not only did the commanding general seek to curb the power granted by the Uniform Code to the accused's immediate commander, but he also trenched upon the right of an accused to be tried by an impartial court-martial. By its express terms, the policy had to be brought to the attention of "every member of every general courts-martial." The concurring member of the Court agrees with us that the terms of the directive were such as to necessarily influence the determinations of the court members. In our opinion, it not only had to influence them, but also the accused's own commanding officer; we cannot separate its effect. In sum, the policy directive directly tended to control the judicial processes rather than merely attempting to improve the discipline of the command. It was, therefore, illegal.

The Government maintains that even if the policy is objectionable, the accused's failure to interpose a motion for appropriate relief at the trial or to challenge the court members constitutes a waiver. It can strongly be argued that error resulting from the exercise of improper command control strikes at the heart of the court-martial system itself, and, therefore, cannot be waived. See United States v Ferguson, 5 USCMA 68, 17 CMR 68, concurring opinion of Chief Judge Quinn. We need not decide that question here. Suffice it to say that there is no showing that the defense counsel at the trial was aware of the policy directive or of Captain Novaky's letter of transmittal. The former is addressed to "Commanders, Class I and II Installations, Units and Activities," and is intended for their personal consideration. The latter is addressed to

---

[1] As a practical matter, Army regulations discourage the reference of such cases to a special court-martial, instead of to a general court-martial. SR 22-145-1. We are not, however, concerned with the propriety of these regulations.

the Commanding General, Medical Training Center. Under these circumstances, we are unwilling to charge defense counsel at the trial with notice of the contents. United States v Schuller, 5 USCMA 101, 17 CMR 101.

In reaching our conclusion, we have not overlooked the serious question of whether the Fourth Army policy constitutes class regulation which contravenes the "guiding norm of our system —Equal Justice Under Law." United States v Navarre, supra, page 38. Certain later modifications of the policy have been brought to our attention. Further changes may have been promulgated by succeeding commanding officers since this case reached us. Consequently, assuming that the modified policy is still extant, we express no opinion whatever on its validity.

The findings of guilty and the sentence are set aside. The charges are returned to The Judge Advocate General of the Army for transmittal to the officer exercising summary court-martial jurisdiction over the accused for his consideration and action. See United States v Clisson, 5 USCMA 277, 17 CMR 277.

Judge FERGUSON concurs.

LATIMER, Judge (concurring in the result):

I concur in the result.

Although I conclude my associates are on sound ground in their ultimate disposition of the case, I prefer to reach that position by a different and more restricted path. In this type of case, we must differentiate between the virtues of command responsibility and the vices of command control. It is just as important to both military justice and discipline that we permit commanders to exploit their command functions as it is that we stamp out any attempt to control the judicial processes. Furthermore, I believe we mislead only ourselves when we proclaim that we have no disposition to curb the commander in his command function—yet effectively deny him any discretion in exercising his powers, by simply saying that he acted improperly. I, therefore, propose a selective approach to this issue.

This case was briefed and argued on the premise that the command letter involved had in some way prevented the accused's commander, who was also the accuser, from exercising an unfettered discretion in the disposition of the charges. The majority opinion concurs with that concept, but when I view the policy directive in its proper perspective, I find it generally to be an appropriate exercise of command responsibility. I will first develop the reasons why that is so and thereafter set forth the reasons which cause me to concur in the result.

In various areas involving disciplinary problems—of which judicial procedure is a necessary part ——the convening authority has certain powers of his own, and unless he exceeds his authority he has a right to control his subordinates without interference by this Court. One of his duties is to determine personally whether a given charge or group of charges warrant trial by general court-martial, and he may go to reasonable lengths to insure that commanders with less authority do not use their offices to nullify his choice of forum. To illustrate my views, I submit the following example: I believe division or comparable Navy and Air Force commanders may properly inform their subordinate commanders that they must not refer robbery, grand larceny, or narcotic cases to special courts-martial without obtaining his special permission. Special courts-martial may be convened by subordinate commanders, Article 23(a), Uniform Code of Military Justice, 50 USC § 587, and if their choice of forum cannot be circumscribed, then those officers commanding higher echelons might be seriously crippled in maintaining order and discipline in their command. On the other hand, the same commanders would have no right to inform members of general courts-martial that they must adjudge a sentence greater than that which could be given by a special court-martial if they found an accused guilty of any one of the enumerated offenses.

300

The determination of an appropriate sentence within the limits set by the President is a prerogative of the court-martial, and the law brooks no interference by commanders with that power. With those principles in mind, I now turn to the provisions of the directive.

The first matter of importance in the letter is the statement that, within a given period, a minority of ■ the command had been responsible for the commission of almost two-thirds of the offenses. The statistics given tended to show that a serious disciplinary problem existed, and I believe any commander worthy of the name would have taken immediate steps to deal with it. Clearly, a situation such as that may be brought to the attention of all officers in the command.

Next, the letter directed commanders to take steps to eliminate from the service those volunteers who had shown, by repeated misconduct, that they were unfit to serve. Surely there is nothing unreasonable in that direction. I wonder if anyone would seriously contend that individuals found unfit to serve should remain on a governmental payroll. I view the criteria announced for the determination of fitness to serve as sound, for habitual offenders have an adverse impact on discipline, morale, cost, and efficiency of the armed service. Furthermore, a service should not be destroyed from within, and the military community must be able to rid itself of those who refuse to live as law-abiding members.

The directive is not defective because it applies only to volunteers and not to inductees, for there is a ■ logical basis for the distinction. First of all, most of the offenses were being committed by individuals among the ranks of the volunteers. Therefore, it was proper to focus attention on that class first. Next, it is reasonable to assume that, under present world conditions, a substantial percentage of the male population will be required to render some military service. The volunteer, by his enlistment, has held out to the Government that he is willing to fulfill his military obligations. If it is later learned that he either will not or cannot live within the law and do the things necessary to render his service acceptable to his nation, it is proper to end the relationship. Induction into the military service, however, may not·be the free choice of the individual concerned, and some persons prefer not to serve, either properly or at all. Therefore, if a member of that class evinces a desire to avoid service by deliberately committing acts of misconduct with a calculated design to be discharged, I cannot say it is improper to make it difficult for him to obtain what he regards as a benefit from his own wrongdoing. I am certain that there are many well-reasoned judicial decisions which have been founded upon that precise equitable premise.

The enumeration of methods of elimination in the directive should not be condemned. The senior ■ commander merely announced that his subordinates were to accomplish the purposes of the directive through the use of general court-martial, resignation, and administrative board action, and it permitted the junior commanders to exercise discretion in selecting a course of action. It is granted that the letter stated that trial by general court-martial should be considered first, but that language is directory in phraseology, and not mandatory. Moreover, in view of the objectives to be accomplished, I believe it to be a permissible order of selectivity.

It is acknowledged that a general court-martial is the highest trial court in the military system, but it is also the only one in the Army which may adjudge a punitive discharge. Paragraph 1, Change 2, SR 22-145-1, May 21, 1951, provides that reporters may not be appointed for special courts-martial, and thus, a verbatim record may not be made. In ultimate result, this means that special courts-martial in the Army may not adjudge a punitive discharge, Article 19, Uniform Code of Military Justice, 50 USC § 579, and the regulation was issued for the perfectly proper purpose of insuring that no individual would be sentenced to a punitive discharge except in a proceeding where he was represented by legally trained·

**301**

counsel. Compare the provisions of Article 27 (b), and 27 (c), Uniform Code of Military Justice, 50 USC § 591. If, then, it is appropriate to use judicial processes to eliminate habitual offenders from the Army, an inferior court-martial cannot be used. Here again, the directive does not assert that a punitive discharge must be adjudged; what it says is that subordinate commanders should select a court-martial with sufficient power to adjudge a punitive discharge if certain conditions exist.

Except in one aspect, I believe this directive says no more than that a certain class is creating a disciplinary problem; that offenders among this class who are unfit to serve must be eliminated from the service; that subordinate commanders who determine that repeated disciplinary offenders should be separated from the service must consider three alternate methods of elimination; and that when trial by court-martial is indicated, the case should be tried by a court-martial which is not denied the power to adjudge a punitive discharge. None of these provisions are improper or unreasonable when presented to a junior commander as a solution to a command problem, and therefore I cannot say that this directive exceeded the bounds reserved to a senior commander in that respect. Compare the directive set forth in United States v Doherty, 5 USCMA 287, 17 CMR 287.

I am not willing to agree that the accused's commanding officer believed that he was bound to recommend trial by general court-martial because of the policy directive. There is nothing to indicate he did not consider the method he selected preferable to the alternatives of resignation or board action. In addition, he must have concluded that the accused had demonstrated such a character deficiency as to be unfitted for further service, for if he had not, there would have been no need for referring to the directive at all. Furthermore, if I assume he was familiar with the directive, I have every reason to believe that he knew the provisions upon which he relied began with the words, "As a general rule", and that it was not phrased in mandatory terms. Therefore, I conclude that the officer knew he had some discretion, but believed that accused's case was a proper one for trial by general court-martial, and so recommended.

This brings me to the reasons for my limited concurrence in this case. In United States v Littrice, 3 USCMA 487, 13 CMR 43; United States v Isbell, 3 USCMA 782, 14 CMR 200; and United States v Navarre, 5 USCMA 32, 17 CMR 32, we were faced with the allegation that various commanders had improperly attempted to influence court-martial members in the performance of their duties as such. We were there required to strike a delicate balance between justice and discipline, and determine whether each instance involved proper instruction or improper coercion. So far as I am concerned, this is the only sensitive area in this case.

I am sure that the commanding general had some purpose in mind when he directed that the contents of the letter be brought to the attention of each and every court-martial member, and I can think of none except to guarantee that the members would assist in the execution of the plan by adjudging a punitive discharge in every case where the accused was a member of the Regular Army and had two prior admissible convictions. If that was not his aim, then there would be no reason to call this letter to the attention of his subordinates in their role as general court-martial members. Obviously, if they do not obey, the whole process would collapse. It is no answer to say that the record does not disclose knowledge on their part, for I must suppose that policy directives emanating from a higher headquarters are complied with by the officers to whom they are directed, and I presume that the contents of this letter were communicated to the members who tried this case. Therefore, in the absence of any evidence to the contrary, the natural conclusion is that these general court-martial members, at the time of their deliberations on the sentence, were aware that: (1) personnel of a certain group were creat-

ing a disciplinary problem; (2) offenders in the group who had two prior convictions should not be retained in the service; (3) this accused is both an offender and a member of the mentioned class; (4) elimination of this accused by a punitive discharge is deemed essential by the convening authority, for otherwise he would have adopted another method; and (5) failure to include a bad-conduct discharge or dishonorable discharge would defeat the policy of the commander. When a balance is struck between improper command control and authorized command instruction, I am sure the policy directive involved here impinged on a prerogative belonging to the court-martial and represented an attempt to influence it improperly. As such, it was unlawful, United States v Littrice, supra.

The Government argues with vigor that the letter merely announces a general rule, and the court-martial members were free to accept or reject the dictates of the letter. There are two replies to that argument. First, the letter gives no indication that the court members are free to follow the dictates of their own conscience. Second, the general rule mentioned in the letter applies to reference only. The whole tone of the letter is to the effect that the command must rid itself of the one class of offenders, and I am certain that a court member listening to the instructions would be led to believe that a failure to impose a punitive discharge would be a violation of the terms of the letter. I am supported in that conclusion by a belated letter from the same headquarters which sought to explain that the policy was suggestive, not directive.

This bring me to the last problem requiring discussion: the question of waiver. It must be said here that defense counsel did not make any objection at trial, did not seek relief of any sort through an appropriate motion, and did not assert any challenge. Far from being thoroughly aired at trial, it was not aired at all. However, the matter was brought to the attention of the board of review, and it was assumed by all parties that it was before the board. Thus, the waiver, if any, could only be enforced for failure to raise the issue at the trial level.

The accused presently stands convicted of wrongful appropriation of a Government vehicle, and I freely concede that the term of confinement which was imposed represents only one-half of the maximum permissible. However, the offense involved was as minor an example of its class as a court is likely to see, involving a slight deviation of less than one mile from the route authorized for the accused, a truck driver embarked on an authorized journey. Therefore, I cannot escape the conviction that there is a fair probability that the punitive discharge adjudged in this case was more the product of a coerced court than a reflection of the nature and severity of the offense. Generally speaking, I have followed the concept that a waiver should not be enforced when to do so would work a miscarriage of justice, and that appears to be the situation here. United States v Fisher, 4 USCMA 152, 15 CMR 152; United States v Henry, 4 USCMA 158, 15 CMR 158. Accordingly, I join in the disposition of this case.