**Albert C. HOMCY**

v.

**Stanley R. RESOR, Secretary of the Army, Appellant.**

**No. 23954.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 4, 1970.

Decided Dec. 16, 1971.

Mr. Thomas Jay Press, Atty., U. S. Department of Justice, with whom Messrs. Thomas A. Flannery, U. S. Atty., and Alan S. Rosenthal, Atty., Department of Justice, were on the brief, for appellant. Messrs. John A. Terry and Nathan Dodell, Asst. U. S. Attys., and Michael C. Farrar, Atty., Department of Justice, also entered appearances for appellant.

Mr. Bingham B. Leverich, Washington, D. C., for appellee.

Before BAZELON, Chief Judge, and WRIGHT and MacKINNON, Circuit Judges.

MacKINNON, Circuit Judge:

During World War II appellee (Homcy) was convicted by a military court martial in France. Since that time he has made a number of attacks upon the trial and his sentence. He here seeks a declaratory judgment (1) that the court martial which tried him on October 19, 1944 was without jurisdiction and void and that as a result his military record should be corrected to show that his discharge from the United States Army on December 5, 1944 was honorable or under honorable conditions; and (2) that a mandatory injunction should issue ordering the Secretary of the Army (appellant) to cause the Army Board for the Correction of Military Records (the Correction Board) to reconsider his application submitted on March 1, 1967 and change his military record to conform to the relief requested.

The District Court granted appellee's cross motion for summary judgment on the ground that the court martial was subjected to improper command influence, that appellee was denied effective assistance of counsel in the proceedings before said court martial, and that he was also denied his constitutional right to a fair trial. The court accordingly held appellee was entitled to have his record corrected to show that his discharge from the United States Army on December 5, 1944 was honorable and remanded the cause to the Correction Board with directions to take appropriate action. We affirm the judgment solely upon the

ground that improper command influence was exerted upon the court martial.

### Facts and Background

Albert C. Homcy's initial enlistment into the Army was on January 24, 1938, and six and one-half years of continuous honorable service followed, including successful completion of Officer Candidate School in November 1942 and receipt of a commendation for "exceptionally meritorious conduct" during the Italian campaign on December 15, 1943 while under "almost constant enemy artillery and mortar fire."

On August 27, 1944, near Concourdia, France, Homcy refused an order from his Battalion Commander to lead a patrol of what he alleges were unqualified and inexperienced men (cooks and bakers) to seek out and destroy enemy tanks or self-propelled guns that were firing into the battalion's position. Homcy was tried by general court martial on October 19, 1944 and found guilty of misbehavior before the enemy—one of the most serious offenses that can be committed by a military man. The court martial sentenced him to be dismissed from the service, to total forfeiture of all pay and allowances, and to be confined at hard labor for fifty years. Four days later all five members of his court martial signed a clemency petition recommending that the period of confinement be reduced to ten years, and that the entire sentence be suspended and Homcy returned to duty. The convening authority reduced the confinement to ten years, but did not suspend any portion of the resulting sentence. Homcy was dishonorably discharged on December 5, 1944.

After fourteen months of confinement, on January 7, 1946 the remainder of Homcy's sentence was vacated to permit him to reenlist. This enlistment terminated on August 24, 1946 with an honorable discharge and appellee has, on a number of grounds, more or less continuously since that time, sought correction of his records to eliminate the dishonor-

able discharge resulting from his court martial. Numerous requests for correction were denied by the Army between 1947 and 1961. In 1961 he was finally accorded a complete evidentiary hearing before the Correction Board, but the Board's recommendation for denial of his application was approved by the Under Secretary of the Army.

A new application, presenting new evidence and new allegations of improper conduct of the court martial was denied without a hearing on April 12, 1967. Thereafter this suit was filed in the District Court on December 22, 1967 and, upon reconsideration, the Army ordered a formal hearing before the Correction Board on Homcy's application. Such hearing was held on July 10, 1968, but the Board again recommended denial of Homcy's application and the Under Secretary of the Army so directed on August 20, 1968. This case had been stayed in the District Court during the Correction Board's hearing, and following the Secretary's affirmation of the Board's recommendation the record of those proceedings was offered by appellants here in support of motions for dismissal or, in the alternative, for summary judgment. Homcy's cross motion for summary judgment was similarly based on the record of the Correction Board hearing. Oral argument was heard on the respective motions, and motions of appellant (Secretary of the Army) were denied and summary judgment was entered in favor of Homcy.

### The Jurisdiction of the Court

■ The "primary position" of appellant in this appeal is "that the court below had no jurisdiction to review a court martial conviction, except by habeas corpus." Brief for appellant, at 6. Appellant concedes that this court, Kauffman v. Secretary of the Air Force, 135 U.S.App.D.C. 1, 415 F.2d 991 (1969); Gallagher v. Quinn, 124 U.S. App.D.C. 172, 363 F.2d 301, cert. denied, 385 U.S. 881, 87 S.Ct. 167, 17 L.Ed.2d 108 (1966), and the First Circuit, Ashe

v. McNamara, 355 F.2d 277 (1965),[1] have denied this contention, but he urges that we reexamine the basis of our prior decisions. Appellant's argument for reconsideration turns primarily on his interpretation of the legislative history of three statutes [2] that were considered either independently or in combination in the three challenged cases. He has not demonstrated, nor has our independent examination revealed, any judicial expression of disapproval of the *Ashe, Gallagher* or *Kauffman* decisions. In *Kauffman* this court reserved judgment pending decision by the Supreme Court in its review of Augenblick v. United States, 377 F.2d 586, 180 Ct.Cl. 131 (1967). In *Augenblick* the Court of Claims cited our *Gallagher* decision and held:

> To deny collateral attack to one not in confinement—the consequence of saying that habeas corpus is the only remedy—would be to deny the possibility of review by a constitutional court, and ultimately by the Supreme Court, of the constitutional claims of servicemen like plaintiff who have not been sentenced to jail or who have been released. (*Id.*, 377 F.2d at 592.)

The Supreme Court reversed *Augenblick*,[3] but did so on the merits and without reaching the jurisdictional issue raised both there and here. Subsequently we held in *Kauffman* that the District Court did have jurisdiction to review alleged constitutional defects in the appellant's court martial conviction. We pointed out that "the deprivation of liberty under an invalid conviction is a grievous injury, but a military discharge under other than honorable conditions imposes a lifelong disability of greater consequence for persons unlawfully convicted by courts martial." *Kauffman, supra,* 135 U.S.App.D.C. at 5, 415 F.2d at 995. Homcy's 26-year effort to lift the disgrace of his dishonorable dis-

charge from his record amply demonstrates the "lifelong disability" we alluded to in *Kauffman.* We find nothing in appellant's interpretation of the legislative history to convince us that our decisions in *Gallagher* and *Kauffman* were wrong; the District Court properly read these cases as authorizing its jurisdiction over this review of the Correction Board's determination of the constitutionality of Homcy's court martial conviction.

### The Composition of the Court Martial

Appellant also contends that even if the jurisdiction of the District Court were proper there were no irregularities in Homcy's court martial that warrant a finding of constitutional deprivation of a fair trial. Three such irregularities were alleged by Homcy in the District Court, and although the order granting summary judgment for appellee mentioned only two of them, all three were argued on this appeal. The point not discussed by the District Court was that the court martial which convicted appellee was improperly constituted because the "law member" specifically detailed to sit as a member thereof was excused during the trial because of other urgent military duties.

■ Article 8 of the Articles of War, 41 Stat. 788 (1920), in effect during World War II, required that one of the members of a general court martial be a "law member, who shall be an officer of the Judge Advocate General's Department, except that when an officer of that department is not available for the purpose the appointing authority shall detail instead an officer of some other branch of the service selected by the appointing authority as specially qualified to perform the duties of law member."

---

1. *See also* Smith v. McNamara, 395 F.2d 896 (10th Cir. 1968).

2. Article 76 of the Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 876 (1970); Article 67 of the UCMJ, 10

U.S.C. § 867 (1970); Legislative Reorganization Act of 1946, § 208, 10 U.S.C. § 1552 (1970).

3. United States v. Augenblick, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969).

*Id.* The history of this Article is aptly summarized by the appellee:

> It is thus evident, both from the explicit language of Article 8 itself, as well as its legislative history, that the whole purpose of the requirement that there be a "law member" appointed or "detailed" to each general court-martial *was to be sure that there was present at the trial someone who would have both some qualifications and the explicit responsibility to supervise the trial* and to advise on questions of law. (Brief for appellee, at 59–60 (emphasis added).)

Appellee argues that his court martial was without jurisdiction in the absence of the appointed law member,[4] or, alternatively, that the law member's absence deprived him of a fair trial. We find, however, that this dual requirement of "explicit responsibility" and "some qualifications" was met during Lieutenant Homcy's trial in the person of Major Harry B. Kelton, who served as president of the court martial. The authority for supervision of the trial in the absence of the law member was assigned to the president of the court by Article 31 of the Articles of War, 41 Stat. 793 (1920): "The law member of the court, if any, or if there be no law member of the court, then the president, may rule in open court upon interlocutory questions, other than challenges, arising during the proceedings . . . ."[5]

Three statements made by Major Kelton in an affidavit taken as part of the proceedings of the Correction Board demonstrate that he was qualified to properly supervise Homcy's trial:

> 18. Prior to Homcy's trial, how much instruction had you received in service schools and elsewhere, on the subject of military justice? I do not recall with regard to a service school, however, I received a normal amount of instruction as a part of training programs. *I familiarized myself with the provisions of the then Articles of War and consulted with the staff judge advocate and his assistant on several occasions. . . .*
>
> 19. Prior to Homcy's trial, how many times had you served as a member at trials by a. General courts-martial? b. Special courts-martial? Approximately 250 to 300 of both general and special court-martials [*sic*], mostly general.
>
> \* \* \* \* \* \*
>
> *In view of the fact that probably I was a member of special and general court-martials [sic] for a longer period and for a greater number of cases than anyone else in the 36th Infantry Division during World War II . . . . .* (Appendix at 97a, 100a, 101a (emphasis added).)

Thus, when the law member was not available, Article 8 provided that the appointing authority shall detail some other officer to perform his duties. In the absence of such appointment Article 31 in effect operated automatically to fill the gap by providing for the president of the court martial to fulfill the law member's duties.[6] Under such circum-

---

4. The record reflects that the officer originally appointed as the law member was excused by the appointing authority through the president of the court because of other urgent military duties.

5. Appellee relies on Hiatt v. Brown, 339 U.S. 103, 70 S.Ct. 495, 94 L.Ed. 691 (1950), in support of his argument that a "law member" specifically detailed as such must sit as a member of the court martial. · In *Hiatt*, however, the member detailed as law member was the "ranking officer of the detail," *id.* at 106, 70 S.Ct. 495, who by virtue of his rank, also sat as the president of the court martial. Thus the facts of *Hiatt* illustrate that the president of the court, if "specially qualified to perform the duties of law member," may serve in both capacities.

6. Article 8 has been interpreted as vesting a discretion in the convening authority as to the appointment of a law member. Hiatt v. Brown, 339 U.S. 103, 70 S.Ct. 495, 94 L.Ed. 691 (1950); Martin v. Mott, 25 U.S. (12 Wheat.) 19, 34–35, 6 L.Ed. 537 (1827); United States ex rel. McClellan v. Humphrey, 181 F.2d 757 (3d Cir. 1950); Henry v. Hodges, 171 F.2d 401, 403 (2d Cir. 1948). When this discretionary power is coupled with the

stances the full purpose of the law member requirement is satisfied and we find no prejudice to appellee since the president (Major Kelton) was qualified by experience and training to act in that capacity. We accordingly conclude that the court was properly constituted and had jurisdiction to try Homcy.

### Effective Assistance of Counsel

With respect to appellant's second contention, the District Court found in favor of Homcy's allegation that he had been denied effective assistance of counsel during his trial. In support of this contention Homcy argues three points, to wit: (1) That his appointed defense counsel, Major Benjamin F. Wilson, Jr., was neither a law school graduate, admitted to practice before any court in the United States, nor certified as a Judge Advocate. (2) That Major Wilson did not have an adequate amount of time to prepare a defense. (3) That Major Wilson's conduct of the defense was insufficient to warrant a finding of effective assistance of counsel. With respect to these contentions the District Court found in favor of appellee in his motion for summary judgment. We disagree with the District Court's findings in this respect.

■ Article 27 of the Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 827 (1970), requires, under new procedures enacted since World War II, that defense counsel in all general courts martial, and in some circumstances even in special courts martial, be fully qualified attorneys. This requirement is, however, purely statutory and did not exist prior to the enactment of the UCMJ in 1950. The absence of a specific requirement for a licensed attorney relegates the question to determining whether his counsel was competent and provided assistance in his defense sufficient to satisfy constitutional standards.

■ Major Wilson had very considerable training in and experience with the law. He had completed two years of law school prior to entering the service, completed a service course in Military Justice, and continued his study of military justice at the Artillery School, the Advanced Infantry Course, and at the Inspector General's School. At the time of Homcy's trial he had served as either a member, trial judge advocate, or defense counsel at some 200–300 general and special courts martial, including 50–100 trials as defense counsel before general courts martial. When one considers that it was not too long ago that many law courses only ran two years and that military law as applied here is basically criminal law which is generally taught as a minor subject in the first year of law school, the extensive training and experience that Major Wilson had in this area of the law made him much better qualified to defend an accused in a court martial proceeding than many fully licensed lawyers.

There is no evidence of any interference with Major Wilson's preparation for the trial, or that he or the appellee had considered that the amount of time they had available for preparation had been inadequate to meet the factually simple and straightforward charge against the appellee.

Finally, considering the unusually strong qualifications of Major Wilson, Homcy's complaints concerning such matters of trial strategy as the calling of witnesses, cross examination, and failure to challenge jurisdiction for the technical absence of the law member cannot support a finding that he was denied effective assistance of counsel.

automatic transference to the president of the duties covered by Article 31, it makes it possible for courts martial to continue to function when the exigencies of the service cause the designated law member to be absent and make it difficult or impossible for the convening authority to replace him. The circumstances under which such powers are most necessary occur when a court martial board is operating, as here, during combat military operations.

### Improper Command Influence

We affirm the District Court's summary judgment for Homcy on the sole basis that the court martial which convicted him was subjected to improper command influence and he was thereby denied his constitutional right to a fair trial.

■ Whenever the convening authority of a court martial addresses its members individually or collectively he must be conscious of the dual role he fills in the military lives of those officers. It is altogether proper for the convening authority to instruct the members in their duties and responsibilities as members of a court martial. However, he must also recognize that as the superior, and most often the commanding officer, of the members, his voice represents the authority which their oaths of office have bound them to obey. Where his instructions conflict with a proper definition of their duties as court martial members, they face a conflict between their duty to obey a superior officer whose presence is continually before them, and a regulation governing an activity in which they will only infrequently participate. In such a conflict, the opportunity for fair and impartial trial of an accused is understandably jeopardized. We find this to have been the case in the court martial of Lieutenant Homcy.

Our first inquiry must be to determine the proper scope of the court martial's responsibility in determining sentence.[7] There are two important aspects to the role of the court martial in imposing sentence. First, a court martial may not,

because of the previous good record of the accused, or other *extenuating circumstances foreign to the merits,* . . . adjudge a mild sentence quite out of proportion to the gravity of the offense committed. . . . [T]he court, in such cases, practically invades the province of the commander, whose function alone it is to determine whether, for any cause, the sentence shall be mitigated or remitted. (Winthrop's Military Law and Precedents 402 (2d ed. 1920) (emphasis added).)[8]

An instruction from the convening authority to the court reminding them of this responsibility would clearly be proper, and a remonstrance that previous courts had failed to respect this prerogative of the convening authority would similarly fall outside the category of impermissible command influence.

■ However, the crucial element of the court's duty is that it not consider matters "foreign to the merits" of the offense in adjudging sentence, yet this duty is not without a degree of ambiguity. Except for a handful of offenses for which mandatory sentences were prescribed by the Articles of War, the initial sentencing was left to the judgment of the court martial trying the specific charges. In the exercise of this authority courts martial were permitted a wide latitude:

[P]roof of valuable service, general good character, or other extraneous circumstances favorable to the accused but foreign to the merits of the case, (although sometimes properly considered upon the Finding as material especially to the question of *intent,)* cannot—*strictly*—be allowed to affect

7. Appellant contends, and we believe properly so, that Homcy's admission at trial that he had disobeyed the order in question constituted adequate grounds for his conviction. But Homcy does not seek a reversal of that conviction in this action, but merely asks for correction of the dishonorable discharge that was given as part of his sentence for that conviction. Thus the sole issue on this appeal is

whether the alleged command influence affected the court's determination of sentence.

8. Juries in criminal cases are frequently instructed along similar lines—that they should not permit sympathy for the defendant to influence them in their verdict.

the discretion of the court in imposing sentence . . . . *In practice,* however, the fact that the accused is shown to have had a good character or record in the service prior to his offense is in general permitted to enter into the question of the punishment to be imposed . . . . (Winthrop, *supra,* at 396 (emphasis in original).)

Outside of this ambivalence toward the relevance of matter foreign to the merits, it is altogether appropriate that the court in determining sentence consider such matters as the nature of the offense itself, the defenses raised, any peculiar circumstances surrounding the commission of the offense, and the intent manifested by the accused. Any direct or indirect interference emanating from the convening authority that would infringe on the court's exercise of this discretion to determine a sentence it considered appropriate to the particular facts presented to them constitutes interference through command influence that deprives the accused of his right to have the court martial adjudge his initial sentence and thereby denies him his constitutional right to a fair and impartial trial.

The District Court found an impermissible degree of command influence of this type in Lieutenant Homcy's court martial and we find adequate evidence in the record to support that finding. The evidence on this issue is not wholly consistent; there is some disagreement about the identity of the officer transmitting the improper pressure, and about the specific times and places of its transmission.[9] One of the members of the court martial, Charles Hickox, totally denies the existence of any improper pressure. But after reading all the statements and affidavits of the principals in Homcy's trial, and after considering the immense gulf between the court's sentence as adjudged and their clemency recommendation made four days later for complete suspension of sentence and return to duty, we are inevitably led to the conclusion that his court martial was constrained by improper command pressure [10] from exercising their honest judgment to award a sentence appropriate to the factual circumstances of Homcy's offense.

We look first to the evidence of impermissible pressure. Perhaps the

9. The variance in the testimony given by members of the court martial as to whether General Dahlquist exerted improper command influence by personally speaking to the members of the Board or whether this was accomplished through the Judge Advocate, is most likely explained by the fact that these members were, at or about this time, also members of other courts martial. The important point is not whether the influence was exerted directly or indirectly but whether it influenced the court martial in Homcy's case. We find sufficient evidence in the record to conclude that it did.

10. Following are the principal cases on improper command influence in the United States Court of Military Appeals: United States v. Johnson, 14 U.S.C.M.A. 548, 34 C.M.R. 328 (1964) (holds that the appearance or existence of command influence provides a rebuttable presumption of prejudice and any doubts must be resolved in favor of the accused). The latter point was considered controlling in United States v. Kitchens, 12 U.S.C.M.A. 589, 31 C.M.R. 175 (1961). Other cases which discuss command influence and co-

ercion of courts martial are United States v. Olson, 11 U.S.C.M.A. 286, 29 C.M.R. 102 (1960); United States v. Shepherd, 9 U.S.C.M.A. 90, 25 C.M.R. 352 (1958); United States v. Lackey, 8 U.S.C.M.A. 718, 25 C.M.R. 222 (1958) (held, where it was possible the accused would not have received a punitive discharge if the trial counsel had not referred to the convening authority, that the error was prejudicial); United States v. McCann, 8 U.S.C.M.A. 675, 25 C.M.R. 179 (1958); United States v. Hawthorne, 7 U.S.C.M.A. 293, 22 C.M.R. 83 (1956) (held, that commanders may not *interfere* with the prerogative of a court martial to impose an appropriate sentence); United States v. Zagar, 5 U.S.C.M.A. 410, 18 C.M.R. 34 (1955); United States v. Hunter, 3 U.S. C.M.A. 497, 13 C.M.R. 53 (1953) (found prejudice to an accused where the convening authority discussed with at least three members of the court the actions of a prior court martial in adjudging a much too meagre sentence to the accused in another case and suggested what verdict should be given); United States v. Littrice, 3 U.S.C.M.A. 487, 13 C.M.R. 43 (1953).

strongest statements on this point were made by Lowell E. Sitton, a member of the court. Mr. Sitton "vividly" remembered "that severe pressures were applied to court martial boards in his division at or about the time of [Homcy's] trial to make findings of guilty 'for the good of the service' *without regard to the rights of the individual or the merits of the particular case* in question." Appendix, at 115a (emphasis added). In response to the Army's investigation of Homcy's application before the Correction Board Mr. Sitton could only recall

> a general tenor of the remarks which the Staff Judge Advocate made and claimed to be quotes from General Dahlquist; the displeasure of the General over some of the past actions of his courts was expressed and *we were directed* for the good of the Service *to have convictions and more severe penalties.* . . . General Dahlquist did not himself address such remarks to the court, but his Staff Judge Advocate did so on at least two occasions. . . . I felt intimidated. If there was absolutely no doubt as to the man's innocence, I would not hesitate to find him not guilty, but in a case of some doubt, my ability to weigh the evidence and evaluate the doubt was definitely impaired. . . .

> [Q]: If such remarks were made, do you think those remarks might ever have caused you to vote to convict a man you would have otherwise voted to acquit? . . .

> [A]: Yes, this could be so, because of the feelings I mentioned above. . . .

> [Q]: *If such remarks were made, do you think those remarks might ever have caused you to vote for harsher punishment than you would have voted for otherwise?* . . .

> [A]: *Definitely, yes.*

> [Q]: Precisely, how were the pressures applied? . . .

> [A]: By the Commanding General [Dahlquist] through the Staff Judge Advocate. . . .

> [Q]: Upon which, if any, of the members, including the president of the court-martial that tried Homcy were the pressures applied? . . .

> [A]: *Upon all the members.* (Emphasis added, Appendix 86a–90a.)

Elden R. McRobert, another of the members of Homcy's court martial, provided the Correction Board's investigation with greater detail than the "general tenor" of Mr. Sitton's recollection. He recalled that Major General Dahlquist had personally addressed remarks to him concerning his duties as a member of a court martial, "not as an individual, but as a member of a court-martial board."

> Q. What were those remarks? . . .

> A. These remarks were directed to the court-martial board in general. He said that we were not doing our job, as we were being too lenient to the soldiers being tried, that *we should find more of them guilty and if they were found guilty then we should assess a stronger sentence* than we had been doing. He also gave us a very strong reprimand that we had not been doing our job and made a statement to the effect that if it were not so much trouble that he would make this a matter of record and report it on our military records.

> Q. . . . when were [such remarks] . . . made? . . .

> A. At or about the time of Lieutenant Homcy's trial. . . . other members of the appointed court-martial board and the Assistant Staff Judge Advocate [were present at the time].

> Q. . . . which, if any, of the members, including the president of the court-martial that tried Homcy were present? . . .

> A. 5 or 6 of the members appointed by Special Order 188 dated 18 Septem-

ber 1944 or Special Order 204 dated 12 October 1944 [Homcy's court]. I am sure it was at one of those court-martial boards. I do recall the weather was good and I am sure it was early in the fall. After the Court-Martial Board left General Dahlquist's headquarters, after he had given the verbal reprimand, we had discussed among all members present and I am sure that I remember without exception that each of us felt that our private rights had been invaded and that General Dahlquist had no authority to do what he had done. (Appendix, at 117a, 119a (emphasis added).)

McRobert further stated that General Dahlquist's remarks could possibly have caused him to vote to convict a man he would otherwise have voted to acquit; to vote for harsher punishment than he would have voted for otherwise; and that Homcy's case was affected by his reaction to the remarks "only insofar that they might have affected all court-martial decisions. I do not remember Homcy's case." Appendix, at 119a.

The existence of improper command pressure was also verified by John M. Stafford, who prosecuted Homcy's case as the Assistant Staff Judge Advocate:

There was command pressure on the Court-Martial Boards of the 36th Division as there were in may [sic] of the Divisions at the time. Usually the pressure was not to make findings of "guilty", but *went to the matter 'of the sentences given.* At the time of the trial of Lt. Homcy, I was informed that the pressures from the C.G. were coming through the usual President of the Court-Martial Board, a Col. Faulkner. (Appendix, at 128a (emphasis added).)

It is also extremely significant that the Assistant Staff Judge Advocate, because of his knowledge of command pressure being applied through the President of the Court-Martial, Colonel Faulkner, challenged Colonel Faulkner in every

trial, though the record shows that in Lt. Homcy's trial Colonel Faulkner was challenged by the defense. However, the Judge Advocate stated:

I do not believe that there was any pressure applied in the Court-Martial of Lt. Homcy, as the President of that Court-Martial Board was Lt. Col. Harry B. Kelton, who I had known for many years, and he was not subject to such pressures, having ideas to the contrary. (Appendix, at 128a.)

However, we conclude that the disqualification of Col. Faulkner to sit on Lt. Homcy's trial did not fully remove the effects of command influence on the court.

Harry B. Kelton, the major who was president of Homcy's court after Lieutenant Colonel Faulkner had been peremptorily challenged by the defense, also recalled command pressure and General Dahlquist's remarks, though he felt that the General "had both the right and the duty to do so if he felt that the court was not exercising mature judgment [sic] in its deliberations." Appendix, at 101a. Major Kelton also recalls that some of the courts martial took action for "the good of the service" but stated that such policy did not extend to "requiring convictions of innocent persons." *This would leave its effect to be confined to punishment.* On this score Major Kelton makes the additional significant statement:

Finally, in the case of Albert C. Homcy, although I do not recall the circumstances nor his trial, I strongly hope that consideration be given to the remaining factor, that time has eroded the vestige of *that which was a wartime necessity in the interest of our nation;* that continued punishment serves no useful purpose, and, in the interest of human compassion, I respectfully urge that the record of this man be viewed with a sympathetic understanding of the tribulations to which he has been subjected during

the years since his conviction. (Appendix, at 101a.) (Emphasis added.) This indicates that he presently views the wartime court martial punishment with which he was connected to have been influenced somewhat by what he considered to have been "a wartime necessity in the interest of our nation." While this indefinite factor alone would not invalidate a sentence, when it is added to the specifics contained in this record, it gives meaning and color to the effect of the particular command influence that was present and operative in this case.

We are also provided with one example of General Dahlquist's displeasure over a court martial's finding in favor of a defendant on the merits of his defense. In a letter from Isidore Charkatz, a member of Homcy's court martial, to the Correction Board's investigating officer this incident is related:

I also recall an incident when I was President of a Court Martial Board where an enlisted man appeared before the Board and pleaded guilty, as charged. Upon reviewing the case, the Court Martial Board found the enlisted man not guilty but recommended that he be discharged from the service under Section 8. [Equivalent to a finding of "not guilty by reason of insanity."]

A few days later I received a call that General Dalquist [*sic*] wished to see me. Upon reporting to the General, he gave me a strong verbal reprimand pertaining to the Board's decision. I was asked to take a letter to each member of the Board to be read and signed and then to be returned to the General. (Appendix, at 113a.)

When all the evidence here is pieced together it clearly supports the finding of the District Court that courts martial convened by Major General Dahlquist at the time of Homcy's trial were subjected to strong and impermissible command influence tending to interfere with those courts' ability to fairly and impartially assess guilt under the reasonable doubt rule and to determine sentences that were appropriate to the offense.

The remaining question is whether this command influence affected Homcy's trial to the extent that we can find on the Correction Board record presented to us that his dishonorable discharge should be changed to honorable. After so long a time, the officers who sat as members of his court have very little recollection of the Homcy case, but they do recall the impact of General Dahlquist's pressure. The influence on McRobert and Sitton, both members of the Board, is referred to above.

That there was some doubt in the Homcy case is reflected by the only concrete memory of the case by any of the members of the court—Mr. Charkatz wrote: "I recall in the Homcy Trial the one statement that he made, was if he obeyed this order given by his Commanding Officer it would mean certain death for him and his detail." Appendix, at 113a. This was the central element of Homcy's defense of impossibility, and even if it were not sufficient to raise that "reasonable doubt" necessary for an acquittal, it was clearly a factor which the court had a right to consider in adjudging sentence. Their determination of an appropriate penalty should not have been *interfered* with in any respect by command influence.

The clemency petition, signed by all five members of Homcy's court martial and recommending a suspended sentence and return to duty instead of the fifty years hard labor, dismissal and forfeiture of pay, strongly suggests that the court, left to its own judgment, considered the facts of Homcy's case to be such as to warrant a second chance for him through a suspended sentence and return to duty. The severity of the sentence adjudged is some indication that the sentence was the product of a coerced court rather than a reflection of the court's uninfluenced judgment of the nature and

severity of the offense. United States v. Hawthorne, 7 USCMA 293, 22 CMR 83 (1956). The sentence actually adjudged by the court is so dramatically more severe than the clemency recommendation that, coupled with the proven attempts of General Dahlquist to improperly pressure courts martial into imposing harsher sentences and the proven effect of such endeavors on the members of the court, we are compelled on the record here to sustain the finding of the trial court that the actual sentence adjudged by the court martial was the product of impermissible command influence on a coerced court and that Homcy was thereby deprived of his constitutional right to a fair trial. *Cf.* United States v. Hawthorne, *supra*.

In reaching our conclusion we have given full consideration to the extremely serious nature of the offense, to the combat conditions under which it was committed, and to the exigencies of wartime operations involving a court martial held in a foreign country during military operations in the field. We recognize that the facts compelled a conviction for the offense and that under the circumstances a severe sentence could have been imposed, but this does not authorize *improper interference* with the court in its adjudication of sentence. Since such interference did take place we accordingly find that the sentence was adjudged improperly.

Finally, we cannot close this opinion without commenting on the complete fairness and objectivity manifested by the military personnel involved in this review proceeding since all the evidence upon which we rely to reach our conclusion was gathered by personnel in the Department of Defense.

The order of the District Court is affirmed to the extent that it is based on the ground that appellee's court martial sentence was illegal because it was based on improper command influence.

Judgment accordingly.