UNITED STATES, Appellee,

v.

Staff Sergeant Prentice E. ADDISON, 072–48–7162, United States Army, Appellant.

SPCM 20512.

U.S. Army Court of Military Review.

21 Feb. 1985.

Lieutenant Colonel Arthur L. Hunt, JAGC, Major Robert M. Ott, JAGC, and Captain Peter L. Yee, JAGC, were on the pleadings for appellant.

Colonel James Kucera, JAGC, Lieutenant Colonel Thomas M. Curtis, JAGC, and Captain Michael W. Hoadley, JAGC, were on the pleadings for appellee.

Before MARDEN, PAULEY, and WERNER, Appellate Military Judges.

## OPINION OF THE COURT

PAULEY, Judge:

Contrary to his pleas, appellant was convicted on 10 January 1984 by a military judge sitting as a special court-martial of willfully disobeying an officer, wrongfully ordering a subordinate to provide a substitute urine sample, and obstructing justice, in violation of Articles 90 and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 890 and 934 (1982). He was sentenced to a bad-conduct discharge, confinement at hard labor for three months, forfeiture of $395.00 pay per month for three months, and reduction to the lowest enlisted grade. The convening authority approved the sentence.

The appellant has raised the issue of unlawful command influence, contending that the convening authority, Major General Thurman E. Anderson, was disqualified to refer his case to trial because of General Anderson's injudicious conduct over an extended period of time; and that such conduct affected the findings and sentence in violation of Article 37, UCMJ, 10 U.S.C. § 837. In opposition, the Government asserts the doctrine of waiver. For the reasons set forth below, we hold that there is presumptive unlawful command influence and that corrective action is warranted.

### I

At appellant's trial, the military judge raised the matter of command influence as follows:

MJ: Thank you. You may be seated.

Mr. Cohen, are you aware of the allegations of command influence that have been made in several Third Armored Division—

IDC: Yes, Your Honor. I should indicate that that played no decision [sic] in the defense's decision to elect to be tried before military judge alone. We have found no evidence to indicate that there would be any impact in this particular case.

MJ: What I have required before, and what I assume you've done, is either waiver or raise that motion.

IDC: We have waived it, Your Honor.

The United States Court of Military Appeals has been clear in asserting that doctrines of waiver will not stand in the way of considering issues of command influence upon appeal. *United States v. Blaylock*, 15 M.J. 190 (C.M.A.1983). We also decline to apply waiver. Aside from the fact that the issue of illegal command influence is generally not one that defense counsel can waive on behalf of his client, *see United States v. Hawthorne*, 22 CMR 83 (C.M.A. 1956); *United States v. Ferguson*, 17 CMR 68 (C.M.A.1954); *United States v. Rivera*, 45 CMR 582 (A.C.M.R.1972); *United States v. Charleson*, 26 CMR 630 (A.B.R.1958), application of the rule is not warranted in this case. To be effective, a waiver must be knowingly and intelligently rendered. *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). We do not perceive that to have been shown from the short colloquy between the judge and appellant's counsel.

### II

In *United States v. Treakle*, 18 M.J. 646 (A.C.M.R.1984), this Court considered *en banc* the issue of unlawful command influence in the 3d Armored Division and determined that Article 37, Uniform Code of Military Justice, had been violated. For the reasons stated in *Treakle*, we find that General Anderson is not disqualified to act as the convening authority in the referral process of the appellant's case. However, we do need to determine, as we did in

*Treakle,* whether Sergeant Addison might have been deprived of favorable character evidence by this unlawful command influence. To do so, we must examine the evidence of record.

On 6 September 1983, the appellant was required to provide a urine sample as part of a regular urinanalysis program in his unit. Sergeant Jones was in charge of this program. He advised Sergeant Addison that he would be required to provide a urine sample per orders of the Battery Commander, Captain Fry. He also told the appellant that Sergeant Bernal would be the "observer." After a noon formation, Sergeant Addison was accompanied by Sergeant Bernal to a latrine. Sergeant Bernal was to observe the appellant and one Sergeant Collins as they provided urine samples. The three men entered the latrine and Sergeant Collins very quickly provided a urine sample which Sergeant Bernal collected and delivered to Sergeant Jones, who was in the Battery executive officer's office just down the hall and on the same floor of the building.

According to Sergeant Bernal, the appellant was unable to urinate. Sergeant Bernal also testified that during this time, Sergeant Addison asked him if someone else could urinate for him. He also asked Sergeant Bernal if he would provide a urine sample for Sergeant Addison. Finally, the appellant indicated that he needed to defecate and asked Sergeant Bernal if he could go into one of the stalls and close the door. Sergeant Bernal allowed him to do so. Sergeant Bernal remained just outside, some three feet from the stall door. About one minute later, Sergeant Addison emerged with a urine sample and gave it to Sergeant Bernal who thereupon again walked down the hall and delivered the sample to Sergeant Jones. As Sergeant Bernal was returning to the latrine, Sergeant Addison was leaving the latrine and walked out of the building. Sergeant Bernal remained in the latrine for awhile, then returned to Sergeant Jones' office and stated that he suspected "that something was going on." He then returned to the latrine again at which time he observed Specialist McCul-

lough leaving the latrine. All of this information was reported to the executive officer who passed it on to the Battery Commander, Captain Fry.

Specialist McCullough testified that just after the noon formation on 6 September 1983, Sergeant Addison approached him and stated: "Mac, I need you to urinate in a bottle for me." He instructed McCullough to go into the last stall in the latrine and wait. He did as he was instructed and some minutes later, Sergeant Addison and Sergeant Bernal entered the latrine. Specialist McCullough testified that he overheard the conversation as previously related and that, after a time, Sergeant Addison entered the stall next to him, passed the urine sample bottle to him and stated in a hushed tone to "Hurry up Mac." McCullough urinated in the bottle and passed it back to Sergeant Addison. He was then told by Sergeant Addison to wait in the stall. He waited "about 10 to 15 minutes" and then departed the latrine. Later on that same day, Specialist McCullough was summoned to the battery commander's office where, after questioning, he signed a statement admitting complicity. Specialist McCullough further related that two days later, Sergeant Addison approached him and asked him not to make further statements and to retract his most recent statement to the commander. He also related that some time later the appellant had threatened to kill him.

Under cross-examination, Specialist McCullough testified that he was a high school graduate with some two years of college course work, in the field of criminal justice. He had been in the Army for about eighteen months. The appellant had been his squad leader for approximately eight months. He related that he did not feel comfortable about providing a urine sample for Sergeant Addison but that he did it because "... he's my squad leader. I do everything he tells me to do." He testified that he would steal from the Post Exchange or kill another soldier in his platoon upon the direct order of a noncommissioned officer. Later he stated that he

believed the consequences of disobeying Sergeant Addison's perceived order would be that his squad leader would "make me do some dirty work." When questioned by the defense counsel concerning his relationship with the appellant, Specialist McCullough testified as follows:

Q: Isn't it true that you didn't like Sergeant Addison?

A: I liked him, sir, as an NCO I did.

Q: Isn't it true that you thought Sergeant Addison was very hard?

A: I thought he was hard, sir.

Q: Isn't it true that you also felt that he had embarrassed you?

A: Yes, sir.

Q: Because he would, when you didn't do something, didn't comply, he would make you do push-ups, he was always making you do push-ups in front of the other service members?

A: Yes, sir.

The defense presented one witness on the merits at appellant's trial. Sergeant Toohey, who was the acting first sergeant for appellant's unit on 6 September 1983 and who had previously testified for the prosecution, was recalled as a defense witness and related a brief conversation that he had had with the executive officer to the effect that no more attempts would be made to obtain a urine sample from Sergeant Addison. The argument of trial defense counsel and the cross-examination of the prosecution witnesses makes it clear that the defense put forth a theory that the appellant did not commit the offenses alleged and that Specialist McCullough's testimony was a fabrication, motivated by his desire to extract revenge for harassment by his squad leader. There was no character evidence of any sort presented on the merits by the defense.

The appellant had attained the rank of staff sergeant during approximately ten years of service. He is married and entered the Army immediately after graduation from high school. Appellant has been assigned overseas on several occasions, to include two tours in Korea. He is the recipient of three awards of the Good Con-

duct Medal. Apparently, the only blemish on the appellant's military record involved allegations of derelictions of duty where. Sergeant Addison, during a training exercise, was negligent in acting as a crew leader on an M163A1 Vulcan resulting in nonexplosive rounds being fired at other vehicles. This incident occurred on 2 March 1983 and Sergeant Addison was duly punished under Article 15, Uniform Code of Military Justice, 10 U.S.C. § 815.

### III

■ Under the facts and circumstances of the case under consideration, we find that evidence of the appellant's good military character and his character for lawfulness would have been relevant and material at his trial. *See United States v. Piatt,* 17 M.J. 442 (C.M.A.1984); *United States v. Clemons,* 16 M.J. 44 (C.M.A.1983). As in *Clemons,* it is clear in this case that the aforementioned traits, when viewed in light of the apparent theory of the defense, would have been evidence of consequence for the trier of fact. This is especially true where, as here, an accused is charged with disobedience of an order. The prosecution's case rested, in great part, on the testimony of Specialist McCullough, who demonstrated under cross-examination, that he might have a motive to fabricate. It is not unrealistic to conclude that strong character evidence on behalf of the appellant might have been sufficient to tip the scales in his favor and result in acquittal. In any case, we will not speculate as to what effect, if any, favorable character evidence might have had on the military judge as the trier of fact. *United States v. Carter,* 19 M.J. 808 (A.C.M.R.1985); *United States v. Abelon,* 19 M.J. 767 (A.C.M.R. 1984).

We also cannot speculate as to why Sergeant Addison did not have favorable character evidence at his trial. *See United States v. Schroeder,* 18 M.J. 792 (A.C.M.R. 1984). It may be because his character was poor and that trial defense counsel, after diligent search, was unable to find someone who would speak favorably in ap-

pellant's behalf. It may also be that there were many officers and noncommissioned officers who would have given favorable testimony but for the fact that they were menaced into silence by unlawful command influence. We cannot ignore the fact that there was no character evidence presented by the defense at this trial. Further, the record provides no explanation for the absence of character evidence. Under these circumstances, we cannot affirm the findings of guilty. *United States v. Thompson*, 19 M.J. 690 (C.M.A.1984); *United States v. Schroeder, supra.*

We hold that the presumption of prejudice, as outlined in *United States v. Treakle, supra,* has not been rebutted by the prosecution and that the appellant, to his prejudice, is presumed to have been deprived of favorable character testimony as the result of unlawful command influence. One of the ways to judicially determine the effect of unlawful command influence on appellant's trial would be through a limited hearing before a military judge appointed by a different convening authority. *See United States v. Thompson, supra.* We shall apply that remedy here.

### IV

The record of trial is returned to The Judge Advocate General for such action as is required to conduct a limited hearing ordered by a different convening authority. At the hearing the military judge will receive all available evidence bearing on the following issues:

1. Was the appellant deprived of favorable character testimony because of remarks by Major General Thurman E. Anderson concerning testimony at courts-martial?

2. If the appellant was not deprived of favorable character witnesses, was Major General Thurman E. Anderson disqualified from reviewing and acting on appellant's case?

The military judge will hear the respective contentions of the parties, permit the presentation of witnesses and evidence, issue orders and rulings as are appropriate, and enter findings of fact and conclusions of law with respect to the two issues listed above. In addition to the preceding questions, the military judge will address any additional questions or issues that he determines are material or relevant to the overall issue of unlawful command influence.

If the military judge determines that the proceedings by which the appellant was originally tried were influenced by unlawful command influence, he will return the record to the convening authority who will set aside the findings and sentence and either dismiss the charges or order a rehearing.

If the military judge determines that unlawful command influence did not affect the appellant's trial but that General Anderson was not qualified to review and act on the appellant's case, he will return the record to the convening authority who will set aside the action by General Anderson and take a new initial action. If the military judge determines that General Anderson was qualified to review and act on the appellant's case, he will return the record to the convening authority who will review those findings and take appropriate action under the provisions of Article 64, UCMJ, 10 U.S.C. § 864.

In the event the convening authority to whom this case is referred deems a limited hearing on the issues of unlawful command influence and General Anderson's qualifications to review and act on the appellant's case impracticable, he will set aside the findings and sentence and either order a rehearing or dismiss the charges.

Judge WERNER concurs.

Senior Judge MARDEN did not participate in the decision of this case.