UNITED STATES, Appellee

v.

Keith E. POPE, Staff Sergeant
U.S. Air Force, Appellant

No. 05-0077

Crim. App. No. 34921

United States Court of Appeals for the Armed Forces

Argued November 8, 2005

Decided April 14, 2006

BAKER, J., delivered the opinion of the Court, in which GIERKE, C.J., and CRAWFORD and EFFRON, JJ., joined. ERDMANN, J., filed a dissenting opinion.


Counsel


For Appellant:  Captain John N. Page III (argued); Colonel Carlos L. McDade, Major Terry L. McElyea, and Captain Martin L. Powell (on brief).

For Appellee:  Captain Kimani R. Eason (argued); Lieutenant Colonel Gary F. Spencer, Lieutenant Colonel Robert V. Combs, Lieutenant Colonel William B. Smith, Major Michelle M. McCluer, and Major Lane A. Thurgood (on brief).

Military Judge:  Sharon A. Shaffer

THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION

United States v. Pope, No. 05-0077/AF

Judge BAKER delivered the opinion of the Court.

After a contested general court-martial before members, Appellant, a recruiter, was convicted of a variety of offenses relating to inappropriate and unprofessional conduct with prospective applicants. The findings of guilt included four specifications of violating a lawful general regulation, one specification of maltreatment, and two specifications of assault, in violation of Articles 92, 93, and 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 892, 893, and 928 (2000), respectively. The adjudged and approved sentence included a bad-conduct discharge, confinement for fifteen months, forfeiture of all pay and allowances and reduction to airman basic (E-1). The United States Air Force Court of Criminal Appeals affirmed in an unpublished decision. United States v. Pope, No. ACM 34921, 2004 CCA LEXIS 204, 2004 WL 1933210 (A.F. Ct. Crim. App. Aug. 30, 2004). We granted review of the following three issues upon Appellant's petition:

I.   WHETHER THE EVIDENCE WAS LEGALLY SUFFICIENT TO CONVICT APPELLANT OF SPECIFICATIONS 2, 3, AND 4 OF CHARGE I (VIOLATION OF A DIRECTIVE PROHIBITING SEXUAL HARASSMENT) BEYOND A REASONABLE DOUBT.

II.  WHETHER AIR EDUCATION AND TRAINING INSTRUCTION 36-2002, PARA. 1.1.2.2.5. (PROHIBITING INAPPROPRIATE CONDUCT AND UNPROFESSIONAL RELATIONSHIPS) BOTH FACIALLY AND AS APPLIED TO APPELLANT VIOLATES DUE PROCESS AND IS UNCONSTITUTIONAL VOID FOR VAGUENESS.

III. WHETHER THE MILITARY JUDGE ERRED WHEN SHE ADMITTED OVER DEFENSE OBJECTION, A PROSECUTION EXHIBIT OFFERED AS

SENTENCING AGGRAVATION EVIDENCE THAT ARGUED AIR FORCE CORE VALUES AND ENDORSED "HARSH ADVERSE ACTION" FOR THOSE WHO COMMITTED APPELLANT'S OFFENSES.

For the reasons that follow, we hold the evidence was legally sufficient to support Appellant's convictions. Further, we hold that the challenged instruction was not unconstitutionally vague and that it provided sufficient notice to Appellant that his conduct was subject to criminal sanction in the context of a recruiter's relationship with applicants. Finally, we conclude that the military judge admitted an impermissible command view on punishment during presentencing. Consequently, a rehearing on sentence is authorized.

BACKGROUND

Appellant was a thirty-five-year-old staff sergeant assigned to the 331st Recruiting Squadron at Maxwell Air Force Base, Gunter Annex, in Alabama. Appellant completed recruiter training and graduated from "Recruiter Technical School" on June 1, 2000. In response to a number of incidents of sexual harassment by Air Force recruiters, each graduating class of recruiters, including Appellant's, was briefed about the problem of sexual misconduct and informed of the consequences if they engaged in such misconduct. Each recruiter was additionally given a letter signed by Brigadier General Peter U. Sutton, Commander of the Air Force Recruiting Service, stating that if they failed to treat applicants respectfully and professionally,

they "should not be surprised when, once you are caught, harsh adverse action follows."

After completing processing at Maxwell, Appellant was sent to a recruiting field office in Athens, Georgia.

A. Appellant's conduct with applicant J.R.B.[1]

J.R.B. first met Appellant at the recruiting office in Athens around September 2000 when she was a seventeen-year-old senior in high school. Appellant initially offered her food and started taking her information. When J.R.B. told Appellant she was an artist, Appellant mentioned that he needed some art for his apartment and stated that he would like to see her artwork. While J.R.B. did not think Appellant expressly stated that he wanted her to come to his apartment, she believed that he implied it. Nothing else unusual happened during this first encounter.

J.R.B. met with Appellant a second time at a recruiting fair outside her school cafeteria. Appellant called out her name and asked that she come to his booth. J.R.B. complied, and the two discussed whether rules in the Air Force were less

_____

[1] The specification on the charge sheet related to J.R.B. was drafted as follows:

> Specification 2: [D]id, at or near Farmington, Georgia, from on or about 1 September 2000 to on or about 31 October 2000, violate a lawful general regulation, to wit: paragraph 1.1.2.2.5.5, Air Education and Training Command Instruction 36-2002, dated 18 April 2000, by engaging in verbal conduct of a sexual nature with J.R.B. that created an intimidating, hostile or offensive environment.

strict than in the Marines.  During the conversation J.R.B. asked whether her eyebrow ring would be permitted in the Air Force.  Appellant, referring to the eyebrow ring, commented, "[t]hat's driving me crazy, that [sic] so sexy."  J.R.B. reported the incident to her French teacher.

At trial, J.R.B. testified that she did not feel intimidated by Appellant, but felt extremely uncomfortable and that after his comments, her "skin was crawling" and she "was all shaky."  Upon defense counsel questioning, J.R.B. also testified that Appellant never asked her out on a date.

B.  Appellant's conduct with applicant P.M.B.[2]

P.M.B. was sixteen years old when she first met Appellant at the recruiting office in October 2000.  Appellant commented that she was "pretty" and also that she had "a lot going for [her]."  On one occasion when P.M.B. was riding back with Appellant in his car from an Air Force entrance exam, he again commented that she was pretty and placed his hand around her knee area for a couple of seconds.  P.M.B. testified that

---

[2] This specification was drafted on the charge sheet as follows:

> Specification 3:  [D]id, at or near Athens, Georgia, on divers occasions from on or about 1 October 2000 to on or about 27 December 2000, violate a lawful general regulation, to wit:  paragraph 1.1.2.2.5, Air Education and Training Command Instruction 36-2002, dated 18 April 2000, by engaging in verbal and physical conduct of a sexual nature with P.M.B. that created an intimidating, hostile or offensive environment.

Appellant's actions could have been done in a conversational way, but that his actions made her feel uncomfortable and intimidated.

C.  Appellant's conduct with applicant A.D.R.[3]

A.D.R. was eighteen years old when she first met Appellant at the recruiting office in July 2000.  A.D.R. testified at trial that Appellant was professional initially, but then he started to get uncomfortably personal.  Appellant inquired why A.D.R. did not have a boyfriend and why her past relationships with boyfriends had failed.  Appellant began looking at his computer, and when A.D.R. asked what he was looking at, Appellant stated it was a picture, but "not the kind you take home to your grandmother."  Appellant repeatedly told A.D.R. that he wanted her to come over to his house at nighttime to take pictures of her, and A.D.R. testified at trial that as she got up to leave, Appellant "look[ed] her up and down."  She also testified that his comments made her "very uncomfortable" and that she never returned to the recruiting office.

---

[3] This specification was drafted as follows:

> Specification 4:  [D]id, at or near Athens, Georgia, from on or about 18 April 2000 to on or about 1 November 2000, violate a lawful general regulation, to wit:  paragraph 1.1.2.2.5.5., Air Education and Training Command Instruction 36-2002, dated 18 April 2000, by engaging in verbal conduct of a sexual nature with A.R. that created an intimidating, hostile, or offensive environment.

DISCUSSION

A.  Sufficiency of the evidence

Regarding his conduct with the three applicants mentioned above, the Government charged Appellant with violating paragraphs 1.1.2.2.5. and 1.1.2.2.5.5. of Air Education and Training Command, Instr. 36-2002, Recruiting Procedures for the Air Force (Apr. 18, 2000) [hereinafter AETCI 36-2002].[4] Appellant renews his argument before this Court that the evidence was not legally sufficient to support his conviction.

---

[4] The portions of AETCI 36-2002 that are at issue in this case state the following:

| | |
|---|---|
| 1.1.2.2.5. | Recruiting personnel will maintain high standards of conduct and be totally professional in their relationships with applicants.  Inappropriate conduct and unprofessional relationships include, but are not limited to, the following: |
| 1.1.2.2.5.1. | Developing or attempting to develop or maintain an intimate personal relationship with an applicant. |
| 1.1.2.2.5.2. | Making sexual advances towards applicants or seeking or accepting sexual advances from applicants. |
| 1.1.2.2.5.3. | Dating or attempting to date any applicant whose processing has begun and has not been terminated due to the applicant's own withdrawal or one of the grounds of unacceptability outlined elsewhere in this instruction. . . . |
| 1.1.2.2.5.4. | Using grade or position, threats, pressure, or promise of return of favors or favorable treatment in an attempt to gain sexual favors from applicants. |
| 1.1.2.2.5.5. | Engaging in any verbal or physical conduct of a sexual nature that creates an intimidating, hostile, or offensive environment. |
| 1.1.2.2.5.6. | Using personal resources to provide applicants with lodging or transportation. |
| 1.1.2.2.5.7. | Accepting an applicant's personal belongings or household goods for storage or any other reason. |

United States v. Pope, No. 05-0077/AF

In determining whether the evidence is legally sufficient, we "'view[] the evidence in the light most favorable to the prosecution'" and decide whether "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" United States v. Brown, 55 M.J. 375, 385 (C.A.A.F. 2001) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). The assessment of the legal sufficiency of the evidence is limited to the evidence presented at trial. United States v. Dykes, 38 M.J. 270, 272 (C.M.A. 1993).

The elements of an Article 92, UCMJ, violation for failure to obey a lawful general order or regulation are: (a) a certain lawful general order or regulation was in effect; (b) the accused had a duty to obey that order or regulation; and (c) the accused violated or failed to obey the order or regulation.

There is no question that AETCI 36-2002 was in effect at the time of Appellant's offenses. The instruction became effective April 18, 2000, over two months prior to his interactions with the applicants involved in this case. Moreover, there is no issue concerning Appellant's duty to obey the instruction. AETCI 36-2002 is the primary instruction used by the Air Force Recruiting Service in providing guidance to recruiters and listing recruitment procedure. It informs all recruiters in the field of their duties, and outlines prohibited conduct with prospective applicants. AETCI 36-2002 expressly

states that "[f]ailure to observe the prohibitions and mandatory provisions . . . may result in punishment under Article 92, or other articles, of the [UCMJ]."

The element in question is whether the evidence proved beyond a reasonable doubt that Appellant failed to obey AETCI 36-2002.

### 1. Conduct with J.R.B.

Regarding his conduct with J.R.B., Appellant was found guilty of violating AETCI 36-2002, paragraph 1.1.2.2.5.5. This provision proscribes "[e]ngaging in any verbal or physical conduct of a sexual nature that creates an intimidating, hostile, or offensive environment." Appellant argues that because he never expressly invited J.R.B. over to his apartment, he cannot be guilty of engaging in verbal conduct of a sexual nature that creates an offensive environment. We disagree. Comments need not be expressly or explicitly sexual to be of a sexual nature. Sexual innuendo, or a recruiter's implied invitation to an applicant that latently suggests sexual activity, may be sexual in nature. Moreover, reasonable triers of fact could have found that Appellant's sexually laden comments to J.R.B. that her eyebrow ring was "driving [him] crazy," and that it was "so sexy," were expressly sexual and contributed to the creation of the offensive environment.

9

2. Conduct with P.M.B.

Regarding Appellant's interaction with P.M.B., he was charged with violating paragraph 1.1.2.2.5. of AETCI 36-2002. That paragraph states that "[r]ecruiting personnel will maintain high standards of conduct and be totally professional in their dealings with applicants." The instruction incorporates an unexhausted list of prohibited behavior, including making or accepting sexual advances from applicants, attempting to date applicants, using threats, promises, or pressure to gain sexual favors, or engaging in verbal conduct of a sexual nature that creates an intimidating, hostile, or offensive environment.

In this case, a reasonable member could have found that Appellant engaged in conduct of a sexual nature with a sixteen-year-old that was in the position of needing to ride alone with Appellant in his car. Reasonable triers of fact could have concluded that by placing his hand on P.M.B.'s knee shortly after commenting on her appearance, Appellant engaged in conduct of a sexual nature and created an intimidating or offensive environment.

3. Conduct with A.D.R.

With respect to A.D.R., Appellant was charged with violating paragraph 1.1.2.2.5.5. of AETCI 36-2002. Under the circumstances of this case, a rational trier of fact could determine that Appellant created an offensive environment by

implying that he was looking at inappropriate images while he was conversing with A.D.R.. Based on A.D.R.'s testimony, the members could also have reasonably concluded that Appellant's invitation to A.D.R. to come to his home alone at night to "take pictures" was anything but a request for an innocent rendezvous, especially in the context of how A.D.R. stated Appellant looked at her.

### 4. Conclusion

Viewing the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Appellant violated AETCI 36-2002 with respect to J.R.B., P.M.B, and A.D.R. by engaging in verbal conduct of a sexual nature that created an intimidating, hostile, or offensive environment. See Brown, 55 M.J. at 385.

Appellant was in a position where prospective applicants had a right to expect that they would be treated with dignity and respect. AETCI 36-2002 requires as much. Applicants expect a recruiter to evaluate them for their skills, potential, and ability to contribute to the Air Force, and not for their sexual appeal.

### B. Constitutionality of the instruction

We now turn to Appellant's constitutional challenge to the instruction. Appellant argues that subjecting him to criminal

sanction for violating AETCI 36-2002 infringes upon his due process rights because the instruction was vague, and he lacked fair notice that sexually offensive conduct could be subject to criminal sanction. In addition, he argues that a reasonable person could not conclude that his particular statements were unacceptable and could subject him to criminal sanction.

To withstand a challenge on vagueness grounds, a regulation must provide sufficient notice so that a servicemember can reasonably understand that his conduct is proscribed. United States v. Moore, 58 M.J. 466, 469 (C.A.A.F. 2003). See also United States v. Vaughan, 58 M.J. 29, 31 (C.A.A.F. 2003) (holding due process requires fair notice that an act is forbidden and subject to criminal sanction). This Court recognizes that possible sources of "fair notice" include: federal law, state law, military case law, military custom and usage, and military regulations. Id. at 31. Training, pamphlets, and other materials may also serve as sources of notice because they may give context to regulations and explain the differences between permissible and impermissible behavior. See Brown, 55 M.J. at 384.

1. Notice of criminal sanction

As a threshold matter we note that the instruction as well as the recruiter school placed Appellant on notice that his conduct was subject to criminal sanction. Appellant completed a

recruiter training course in which he was instructed on proper comportment with applicants and informed of rules prohibiting sexual misconduct. The Staff Judge Advocate (SJA), Major Robert Mitchell, testified at trial that he interacted with recruiters from July 1998 through July 2000 as they came through "Recruiter Technical School" training, and that he warned applicants, including Appellant's June 2000 class, about the consequences of engaging in misconduct.[5] Major Mitchell discussed several high profile sexual misconduct cases with recruiters in training to "let them see if they decide not to obey . . . what's going to happen." Upon graduation from training, every recruiter in the Air Force Recruiting Service was given a folder with a letter signed by Brigadier General Peter U. Sutton, Commander of the Air Force Recruiting Service, stating that such misconduct "will not be tolerated."[6] Major Mitchell testified that the issue was

---

[5] Although Major Mitchell testified on sentencing, his testimony is nonetheless relevant to our analysis and resolution of the constitutional issue.

[6] Paragraph two of the letter states:

> There is an important reason that AFI [Air Force Instruction] 36-2002 forbids recruiters from engaging in unprofessional relationships with applicants. Whether you feel powerful or not, each recruiter is in what is viewed as an influential position. The bulk of our applicants are vulnerable young people, often teenagers. You hold substantial power in their lives . . . at least in their minds, as well as in the eyes of their parents. Even in cases where the facts indicate consensual sexual activity, the victims often feel like an agent of the Air Force took advantage of them. You must keep your relationships with applicants professional -- period!

Paragraph four of the letter states:

so important that "almost every Commander gave it to them a second time when they got to their units." Moreover, the instruction itself is a source of notice. The instruction expressly states that failure to observe its prohibitions may result in punishment under Article 92, UCMJ, and that compliance is mandatory.

2. Was the regulation vague as applied in context?

Appellant primarily argues that even if he were on notice as to the general criminal prohibition regarding sexual contact with applicants, the instructions were too vague to provide him with fair notice as to what specific types of conduct would be prohibited. He contends that the vagueness of AETCI 36-2002 is apparent when compared with other sexual harassment directives in the armed forces that provide specific examples of prohibited conduct. For example, Appellant posits Dep't of the Navy, Sec'y of the Navy Instr. 5300.26C, Policy on Sexual Harrassment (Oct. 17, 1977) [hereinafter SECNAVINST 5300.26C], discussed in United States v. Jones, No. NMCM 200000845, 2003 CCA LEXIS 4, at *8-*16, 2003 WL 131691, at *3-*7 (N-M. Ct. Crim. App. Jan 16, 2003)

---

Remember, "integrity first" and "service before self" are two of our core values. These two types of misconduct violate those principles. The citizens of this country demand that we treat our applicants respectfully, equitably, and ethically. This command and the US Air Force will accept no less. If you choose to ignore these important rules for the sake of your own pleasure or esteem, you should not be surprised when, once you are caught, harsh adverse action follows.

14

(unpublished), as a proper model of clarity.  Unlike AETCI 36-2002, SECNAVINST 5300.26C provides a detailed summary of the criteria for sexual harassment.  It discusses "the range of workplace behaviors that may constitute sexual harassment" and "utilizes a 'traffic light illustration . . . in which behaviors are divided up into three zones, corresponding to a traffic light.'"  Jones, 2003 CCA LEXIS 4, at *15, 2003 WL 131691, at *6 (citing SECNAVINST 5300.26C, enc. (2), para. 4).  Behavior falling in the "yellow zone," which may or may not constitute sexual harassment, includes violating personal space, whistling, questions about personal life, lewd and suggestive comments, repeated requests for dates, and sexually suggestive touching or gesturing.  Jones, 2003 CCA LEXIS 4, at *15-*16, 2003 WL 131691, at *6.

In another context it may be prudent to have specific prohibitions illustrated with examples in order to identify criminal conduct; however, the question here is whether the regulation is constitutionally vague as applied to a recruiter's conduct with applicants.  In the context of recruiting, an instruction as detailed as SECNAVINST 5300.26C is not required.  AETCI 36-2002 is clear that sexual conduct by recruiters with applicants is prohibited, and recruiters must be "totally professional in their relationships with applicants."  AETCI 36-2002, 1.1.2.2.5.  It was not necessary for the Air Force

15

recruiting instruction to identify every possible nook and cranny in the line of conduct, for the line is straight and narrow.

Moreover, this introductory paragraph of the regulation incorporates the subordinate paragraphs that follow. The subordinate paragraphs provide a range of illustrative, but not exhaustive conduct that would violate the regulation. For example, recruiters are prohibited from "attempting to date any applicant" or "making sexual advances towards applicants." Id. at 1.1.2.2.5.3; 1.1.2.2.5.2. With such notice, a reasonable servicemember need not have pondered whether placing his hand on an applicant's knee while riding alone with her in a car, inviting an applicant to his apartment at night to take pictures, or telling an applicant that her appearance was "driving [him] crazy" and was "so sexy," were prohibited.

Given the evolving and innumerable ways in which sexually offensive conduct may occur in the recruiting context, the Air Force was not required, as a matter of law, to expressly set forth all conceivable instances of impermissible conduct. In our view, the language of AETCI 36-2002 provided ample discussion of the types of behavior prohibited by the regulation and a reasonable person would have been on notice that misconduct of the sort engaged in by Appellant was subject to criminal sanction.

### 3. First Amendment Challenge

Finally, Appellant argues that AETCI 36-2002 impermissibly curtails a recruiter's First Amendment rights to expression. While intimidating, hostile or offensive speech may be tolerated in civilian society, in the armed forces, other considerations also come to bear. Restrictions on speech may exist that have no counterpart in civilian society. Parker v. Levy, 417 U.S. 733, 759 (1974). "'[T]he right of free speech in the armed services is not unlimited and must be brought into balance with the paramount consideration of providing an effective fighting force for the defense of our Country.'" United States v. Brown, 45 M.J. 389, 396 (C.A.A.F. 1996) (quoting United States v. Priest, 21 C.M.A. 564, 570, 45 C.M.R. 338, 344 (1972)). Proper relations between recruiters and applicants in the armed forces are indispensable in attracting young people to serve their country and in maintaining military discipline. Intimidating, hostile, or offensive conduct of a sexual nature by recruiters drives potential applicants away from military service and undermines the effectiveness of the armed forces.[7]

## C. Admission of the commander's letter

During the sentencing phase of Appellant's trial, the Government moved to admit in aggravation the letter from

---

[7] The record reflects that all three of the applicants involved in this case dropped out of the recruitment process following their interactions with Appellant.

Appellant's commander, Brigadier General Peter U. Sutton,
Commander of the Air Force Recruiting Service.[8]  According to the
trial counsel, this exhibit was in support of the anticipated
testimony of the SJA of the Recruiting Service, Major Mitchell.
The theme of the letter as it related to Appellant's charged
misconduct was that "unprofessional relationships with
applicants . . . will not be tolerated."  After explaining how
such misconduct, specifically sexual misconduct, erodes the
integrity and effectiveness of the recruiting effort, the letter
concluded with the following:  "If you choose to ignore these
important rules for the sake of your own pleasure or esteem, you
should not be surprised when, once you are caught, harsh adverse
action follows."

Trial counsel's position was that Major Mitchell would
testify that this letter was provided to every recruiter coming
through "Recruiting Technical School," including Appellant.  The
Government's argument was that the letter demonstrated the
aggravating nature of Appellant's conduct because he had
knowledge of what standard of conduct was expected of

---

[8] This letter was also discussed above in Part B, and was introduced during
the sentencing phase as a source of notice that Appellant's conduct was
subject to criminal sanction.  However, a different question presented here
is whether the letter should have been admitted on sentencing, in light of
its apparent reference to a command policy, without providing the members
with an instruction as to how the command view should be considered.

recruiters, and notwithstanding, chose to conduct himself otherwise.

Defense counsel objected on the basis of Rule for Courts-Martial (R.C.M.) 403 and argued, among other things, that the letter impermissibly introduced command policy into the sentencing process. Defense counsel's specific concern was the statement seemingly endorsed "harsh adverse action." The military judge disagreed and admitted the letter, concluding that she discerned "[no] type of policy argument, or policy statement in the letter like in drug offenses where a Commander might say 'You will not remain in the Air Force'. . . . I don't see any . . . policy . . . statement that says 'You're going to be kicked out of the Air Force.'"

We review a military judge's decision to admit evidence on sentencing for a clear abuse of discretion. United States v. Manns, 54 M.J. 164, 166 (C.A.A.F. 2004). We have long recognized "the need in the service for a broad regulatory authority for the maintenance of discipline." United States v. Fowle, 7 C.M.A. 349, 351, 22 C.M.R. 139, 141 (1956); United States v. Hawthorne, 7 C.M.A. 293, 299, 22 C.M.R. 83, 89 (1956). "A policy directive may be promulgated to improve discipline; however, it must not be used as leverage to compel a certain result in the trial itself." Fowle, 7 C.M.A. at 351, 22 C.M.R. at 141. Thus, we have condemned references to command policies

19

or views "which in effect bring[] the commander into the deliberation room." United States v. Grady, 15 M.J. 275, 276 (C.M.A. 1983). Such a practice invades the province of the sentencing authority by raising the spectre of command influence. Id.

In this case, the military judge's rationale for concluding that no impermissible command policy was being introduced, while partially accurate, did not reach far enough. While the letter does not suggest that one convicted of this type of misconduct should be punitively separated, "'the appearance of improperly influencing the court-martial proceedings'" is troubling because it conveys the command's view that harsh action should be taken against an accused. Id. (quoting Hawthorne, 7 C.M.A. at 297, 22 C.M.R. at 87). It is just such an appearance that we have cautioned against in the past. Id. "A trial must be kept free from substantial doubt with respect to fairness and impartiality." Id. at 276; Fowle, 7 C.M.A. at 352, 22 C.M.R. at 142. Moreover, the letter was admitted without the benefit of an instruction to the members as to how such a view should be considered. Consequently, consistent with this Court's practice, we are not convinced beyond a reasonable doubt that these members were not influenced by the letter. United States v. Thomas, 22 M.J. 388, 394 (C.M.A. 1986).

United States v. Pope, No. 05-0077/AF

## DECISION

The decision of the United States Air Force Court of Criminal Appeals is affirmed with respect to the findings but reversed as to the sentence.  The sentence is set aside.  The record of trial is returned to the Judge Advocate General of the Air Force.  A rehearing on the sentence is authorized.

United States v. Pope, 05-0077/AF

ERDMANN, Judge (dissenting):

The majority holds that paragraph 1.1.2.2.5.5. of Air Education and Training Command, Instr. 36-2002, Recruiting Procedures for the Air Force (Apr. 18, 2000) [hereinafter AETCI 36-2002] is not unconstitutionally vague and therefore does not violate Pope's constitutional right to due process. Because I find that the language in this instruction prohibiting "verbal or physical conduct of a sexual nature that creates an intimidating, hostile, or offensive environment[]" failed to put Pope on notice that the conduct in which he engaged would subject him to criminal sanctions and failed to provide adequate enforcement standards, I respectfully dissent. As I would find the language in the instruction unconstitutionally void for vagueness, I would set aside the findings for Specifications 2, 3, and 4 of Charge I and the sentence.[1]

AETCI 36-2002 provides:

> 1.1.2.2.5. Recruiting personnel will maintain high standards of conduct and be totally professional in their relationships with applicants. Inappropriate conduct and unprofessional relationships include, but are not limited to, the following:
>
> . . . .
>
> 1.1.2.2.5.5. Engaging in any verbal or physical conduct of a sexual nature that

---

[1] Because I would reverse on Issue II, I would not reach the remaining issues.

> creates an intimidating, hostile, or
> offensive environment.[2]

"No person shall be . . . deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." Grayned v. City of Rockford, 408 U.S. 104, 108 (1972).

> The void-for-vagueness doctrine requires that a penal
> statute define the criminal offense with sufficient
> definiteness that ordinary people can understand what
> conduct is prohibited and in a manner that does not
> encourage arbitrary and discriminatory enforcement.
> Kolender v. Lawson, 461 U.S. 352, 357 (1983).  The
> same facets of a statute usually raise concerns of
> both fair notice and adequate enforcement standards.
> Hence the analysis of these two concerns tends to
> overlap.  The Supreme Court, however, while recently
> recognizing the second concern as more important,
> continues to treat each as an element to be analyzed
> separately.  See id. at 357-58.

> The degree of specificity which the Constitution
> demands depends on the nature of the statute.
> Criminal statutes must be more precise than civil
> statutes because the consequences of vagueness are
> more severe. . . .  Finally, the Constitution demands

---

[2] Specification 3 of Charge I alleges that Pope violated paragraph 1.1.2.2.5. of the instruction while Specifications 2 and 4 of Charge I allege that Pope violated paragraph 1.1.2.2.5.5. of the instruction.  However all the specifications were treated as if they charged a violation of paragraph 1.1.2.2.5.5.  All of the specifications charge him with "engaging in verbal conduct of a sexual nature with [the victim] that created an intimidating, hostile, or offensive environment."  The military judge's instructions to the members stated that to find Pope guilty they had to find that he violated paragraph 1.1.2.2.5.5.

more clarity of laws which threaten to inhibit constitutionally protected conduct, especially conduct protected by the First Amendment.

United States v. Gaudreau, 860 F.2d 357, 359-60 (10th Cir. 1988) (footnotes omitted).[3]

This court has recognized that a regulation is void for vagueness if it does not provide sufficient notice for a servicemember to reasonably understand that his conduct is proscribed. United States v. Moore, 58 M.J. 466, 469 (C.A.A.F. 2003).[4] Paragraph 1.1.2.2.5.5. of AETCI 36-2002 fails on both the "notice" and "adequate enforcement standards" grounds. The broad language in the instruction does not enable ordinary people to understand what conduct is prohibited. Other administrative and criminal provisions addressing this type of conduct recognize a need for further definition. Further, AETCI

_____

[3] In Parker v. Levy, 417 U.S. 733, 756 (1974), the Supreme Court stated: "Because of the factors differentiating military society from civilian society, we hold that the proper standard for review for a vagueness challenge to the articles of the [Uniform Code of Military Justice (UCMJ)] is the standard which applies to criminal statutes regulating economic affairs." Pope does not challenge an article of the UCMJ, but rather an Air Education and Training Command (AETC) instruction adopted by an executive branch agency. The deference that the Supreme Court granted to Congress in regulating conduct in the military should not apply to an instruction adopted by a military commander which has criminal consequences.

[4] While the majority relies in part on the conclusion that a reasonable member could have found that Pope's conduct resulted in sexual conduct that created an intimidating or offensive environment, that is simply not the correct test in a constitutional void for vagueness analysis. United States v. Pope, 62 M.J. __ (10-12) (C.A.A.F. 2006).

36-2002 fails to provide any standards to guide those charged with enforcement of the instruction which encourages arbitrary or discriminatory enforcement.

In order to be prohibited under the language of paragraph 1.1.2.2.5.5., AETCI 36-2002, it is not enough that the conduct is of a sexual nature, it must also create an intimidating, hostile or offensive environment. While the instruction does limit the scope of the prohibition to a recruiter's relationship with an applicant, it does not further define "conduct of a sexual nature". It also fails to define or further explain what constitutes an "intimidating, hostile, or offensive environment". The "conduct of a sexual nature" and "intimidating, hostile, or offensive environment" language is familiar to those who deal with sexual harassment issues in both the civilian and military context, as it comes from the definition of "sexual harassment" adopted by the Equal Opportunity Employment Commission (EEOC):

> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work

4

> performance or creating an intimidating,
> hostile, or offensive working environment.

29 C.F.R. § 1604.11(a) (2005). However, in sharp contrast to AETCI 36-2002, the EEOC regulation is accompanied by extensive policy guidance as to what constitutes "conduct of a sexual nature" and a "hostile" environment. See EEOC Notice No. N-915-050, Policy Guidance on Current Issues of Sexual Harassment (Mar. 19, 1990) [hereinafter EEOC Policy Guidance]. The EEOC Policy Guidance notes that "[u]nless the conduct is quite severe, a single incident or isolated incidents of offensive sexual conduct or remarks generally do not create an abusive environment."[5] Id. at para. C(2)

The EEOC Policy Materials also adopts an objective "reasonable person" standard to evaluate when harassment is sufficiently pervasive or severe to constitute a hostile environment and whether challenged conduct is of a sexual nature. Id. at para. C(1). It is constitutionally troublesome that the EEOC regulation provides more definition than does AETCI 36-2002, yet the EEOC regulation does not subject an individual to criminal sanctions as AETCI 36-2002 does.

It is also instructive to compare the language of AETCI 36-2002 to policies and regulations adopted by the Air Force and

---

[5] The EEOC Policy Guidance also notes, "sexual flirtation or innuendo, even vulgar language that is trivial or merely annoying, would probably not establish a hostile environment." Id. at para. C.

other branches of the armed forces that are derived from the EEOC definition.[6] Similar to AETCI 36-2002, these service regulations can provide the basis for criminal sanctions under Article 92, UCMJ, 10 U.S.C. § 892 (2000). Unlike AETCI 36-2002, however, these service regulations provide further explanation and guidance as to what type of conduct is prohibited and what type of conduct is allowed under the regulation.

The military has generally adopted a standard that not only utilizes the "objective reasonable person" standard similar to the EEOC, it also has added the subjective viewpoint of the victim.[7] Dep't of Defense Dir. 1350.2, Military Equal Opportunity (MEO) Program E2.1.15.3 (Aug. 18, 1995) [hereinafter DoD Directive 1350.2] defines "sexual harassment" using the EEOC language and provides that the conduct must be "so severe or pervasive that a reasonable person would perceive, and the victim does perceive, the work environment as hostile or offensive." The directive goes on to define the "[w]orkplace" environment as including conduct, "on or off duty, [twenty-four] hours a day." Id. The Air Force has also adopted this same

---

[6] See J. Richard Chema, Arresting "Tailhook": The Prosecution of Sexual Harassment in the Military, 140 Mil. L. Rev. 1, 7-8 (1993).

[7] For a discussion as to the difficulty in adopting the EEOC language into the military context, see Michael F. Noone, Chimera or Jackalope? Department of Defense Efforts to Apply Civilian Sexual Harassment Criteria to the Military, 6 Duke J. Gender L. & Pol'y 151 (1999).

standard in Dep't of the Air Force, Instr. 36-2706, Military Equal Opportunity Program (July 29, 2004) and Dep't of the Air Force, Pamphlet 36-2705, Discrimination and Sexual Harassment (Feb. 28, 1995). The lack of definition and enforcement guidance in AETCI 36-2002 is inconsistent with general Air Force policy.

The current Navy regulation on sexual harassment, Dep't of the Navy, Sec'y of the Navy Instr. 5300.26D, Policy on Sexual Harassment (Jan. 3, 2006), contains the same prohibitions as the EEOC regulation quoted above, but goes even further than DoD Directive 1350.2 in providing guidance as to that language. It includes a definition of the "reasonable person standard" as an "objective test used to determine if behavior meets the legal test for sexual harassment," along with a three-page discussion of the "range of behaviors which constitute sexual harassment" that includes the traffic light illustration described by the majority. Id. at enc. (1) and (2). The Army also has regulation which contains a version of the EEOC definition and provides examples of different categories of sexual harassment including verbal conduct, nonverbal conduct, and physical contact. See Dep't of the Army, Reg. 600-20, Personnel-General, Army Command Policy Ch. 7 (Feb. 1, 2006). In contrast, AETC has not developed any further definition or explanation of the same terms used in the instruction in question.

7

The EEOC and the branches of the armed forces have determined that the "conduct of a sexual nature" and "hostile environment" language requires further definition and explanation in order to be understood by those to whom the language is applied.  If persons who are subject to the EEOC and other military service policies and regulations on sexual harassment require further definition and explanation to know what conduct is prohibited in those contexts, there is no reason that a "person of ordinary intelligence" who is subject to AETCI 36-2002 would not also need those additional definitions and explanations.

In addition to the lack of definition, there is no guidance in AETCI 36-2002 as to what standard is to be applied by those who enforce the instruction.  For example, questions such as should an objective or subjective standard be used and should the incident be viewed through the eyes of the victim or a reasonable person are left unanswered.  With no standards to rely upon, those who initiate criminal sanctions for violation of AETCI 36-2002 must necessarily do so in an arbitrary manner. See City of Chicago v. Morales, 527 U.S. 41, 52 (1999) (citing Kolender v. Lawson, 461 U.S. 352, 358 (1983)).

I agree with the majority that sexual harassment should not be tolerated in the recruiting context –– just as it should not be tolerated in any military context.  But if AETC intends, as

the majority holds, to have a zero tolerance policy for sexual harassment that differs from the sexual harassment policy utilized by the rest of the Air Force, the other services and the EEOC, their instruction should make that clear. I disagree with the majority that in the context of recruiting a lack of definitions and standards for conduct that constitutes a sexual harassment criminal offense is acceptable.[8]

I do not reach a conclusion as to whether Pope's actions violated the language of the instruction. The question before this court is whether the instruction was adequate to inform him what conduct would be prohibited and whether the instruction provides adequate enforcement standards. Which definitions and standards are utilized is crucial to determining whether Pope's conduct violated the instruction. Under the commonly accepted definitions and standards of the EEOC and other service regulations, Pope's conduct may not have violated the instruction. Under the vague standard affirmed by the majority, his conduct did violate the instruction. This conflict illustrates the problems presented where there is a lack of notice and inadequate enforcement standards.

---

[8] While the majority recognizes that it might be prudent in other contexts to provide further guidance in order to identify potential criminal conduct, it concludes that it is somehow not necessary in a recruiting context.

The majority finds that the language of the instruction, along with the directions against misconduct given to Pope during his recruiter training, were sufficient to provide Pope with notice that his behavior would subject him to criminal sanctions. Pope, 62 M.J. at __ (13).[9] Generally, unless a statute infringes on First Amendment rights, it will be evaluated "in light of the facts of the case at hand." United States v. Mazurie, 419 U.S. 544, 550 (1975). Pope raises First Amendment concerns in his brief that should limit the analysis to the language of the statute.[10] However, even if the statute were evaluated "in light of the facts of the case at hand", at best Pope was informed that nonspecific misconduct could result in harsh consequences. The record does not reflect that he was informed at any time during his training as to what constitutes "conduct of a sexual nature", or what constitutes an "intimidating, hostile, or offensive environment" under AETCI 36-2002.

Pope could not have known whether his conduct would fall under AETCI 36-2002 without being aware of the definitions and

_____

[9] This finding addresses only the "notice" prong of the vagueness analysis and does not impact the "adequate enforcement standard" prong.

[10] See United States v. Harriss, 347 U.S. 612, 617 (1954) (in reviewing the definiteness of a criminal statute the Court was "not concerned with the sufficiency of the information as a criminal pleading" but with "the statute on its face").

the standards to be applied.  Similarly, with no further definitions and standards, those charged with enforcement of the regulation have no guidance to ensure uniform enforcement that results in arbitrary enforcement of the instruction.  The lack of definitions and standards does not create more certainty, it creates the very ambiguity that the void for vagueness doctrine is designed to address.  As I find the language of AETCI 36-2002, paragraph 1.1.2.2.5.5., to be unconstitutionally void for vagueness, I would set aside the findings for Specifications 2, 3, and 4 of Charge I and the sentence.